NANCY B. FARRELL, EXECUTRIX (ESTATES OF
MARY D. BLAKELY AND WALTER BLAKELY)
ET AL. *v.* DAVID M. BASS ET AL.
(AC 25314)

DiPentima, Gruendel and Dupont, Js.

Argued April 20—officially released August 23, 2005

*Gary J. Strickland*, for the appellants (plaintiffs).

*Frank H. Santoro*, with whom were *Andrew S. Wildstein* and *Joyce A. Lagnese*, for the appellees (defendants).

*Opinion*

DUPONT, J. In this medical malpractice action, the plaintiffs, Nancy B. Farrell and Cynthia B. Grocki,[1]

---

[1] The plaintiffs, Nancy B. Farrell and Cynthia B. Grocki, are executrices of the estate of Mary D. Blakely. The plaintiffs' decedent was a patient of the defendant, David M. Bass, who was an employee of the defendant, David M. Bass, M.D., P.C.

appeal from the judgment of the trial court, rendered after a jury trial, in favor of the defendants, David M. Bass, a plastic surgeon, and his medical practice, David M. Bass, M.D., P.C. The verdict was based on a single interrogatory and its answer by the jury, namely, that Bass had not deviated from the standard of care for plastic surgeons in similar circumstances.[2]

The issues in this appeal relate to the court's rulings on the relevance of the evidence of two physicians offered by the plaintiffs to prove a deviation by Bass from the applicable standard of care. The questions for our review are whether the court abused its discretion by (1) failing to permit expert testimony on the relevant standard of care from two of the plaintiffs' expert witnesses who were not health care providers practicing in the same medical specialty as Bass and (2) prohibiting questions by the plaintiffs during the cross-examination of the defendants' expert witness and the direct examination of the plaintiffs' third expert witness on the substance of certain medical literature. We affirm the judgment of the trial court.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

The first question requires a review of the allegations of the plaintiffs' complaint, an interpretation of General Statutes § 52-184c (c) and (d), and a review of the plaintiffs' offer of proof as to the testimony of two of their

---

The second count of the plaintiffs' complaint alleged a loss of consortium by their decedent's husband, Walter Blakely. He died on April 10, 2001, and is also the decedent of the plaintiffs in this action. Because his action is derivative of that of Mary D. Blakely, the jury also returned a verdict in favor of the defendants on count two of the complaint. Hereafter, we refer in this opinion to Mary D. Blakely as Blakely.

[2] This appeal does not concern proximate cause as an element of the medical malpractice cause of action. The jury never reached that issue, having concluded by its answer to the preliminary interrogatory that Bass did not violate the applicable standard of care.

three medical experts on the applicable standard of care. We also must review the testimony of the plaintiffs' third expert witness, who was allowed to testify on the standard of care governing Bass' treatment of the plaintiffs' decedent, Mary D. Blakely.

In their complaint, the plaintiffs alleged that Bass deviated from the applicable standard of care by (1) failing to contact Blakely's internist or cardiologist prior to ordering a change or interruption in her anticoagulant medication regime, (2) erroneously directing Blakely to interrupt her anticoagulation medication regime, (3) failing to explain alternative methods of changing anticoagulants, and (4) failing to explain the risks and benefits of proceeding with the incisional biopsy performed by Bass without interruption of that medication regime. The plaintiffs alleged that as a result of those deviations from the applicable standard of care, Blakely suffered a debilitating embolic stroke three days after the surgery, which diminished her ability to pursue and to enjoy her activities and which was a substantial factor in her death. There is no dispute that the anticoagulant was Coumadin and that Bass thought its use should be suspended prior to the performance of the incisional biopsy.

The defendants filed a motion in limine to preclude the plaintiffs from offering the testimony of two expert witnesses, physicians Stanley Bernstein and John Miller, as to the standard of care applicable to Bass because Bernstein and Miller were not "similar health care providers" as required by § 52-184c (c)[3] and

---

[3] General Statutes § 52-184c, entitled "Standard of care in negligence action against health care provider. Qualifications of expert witness," provides in relevant part: "(c) If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a "similar health care provider" is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a

because they did not possess the training that would allow their testimony under § 52-184c (d).[4] The plaintiffs disclosed them, along with James Shearer, a board certified plastic surgeon, as expert witnesses who would testify as to the applicable standard of care.[5] The motion alleged that Bernstein was a board certified internist and cardiologist and that Miller was a board certified cardiologist and electrophysiologist. Bernstein testified on January 9, 2004, Shearer testified on January 13, 2004, and Miller testified on January 14, 2004.

The defendants' motion also stated that Bass had recommended that Blakely discontinue taking Coumadin, a blood thinner, for two days prior to the surgery and to resume it the evening of the surgery.[6] Bass instructed Blakely to notify her primary care physician about the recommendation. In the motion, the defendants argued that the question presented was "whether a plastic surgeon who is to perform a facial biopsy is required to personally contact a patient's primary care physician to discuss his recommendation to discontinue blood thinning medication or whether it is within the standard of care to instruct the patient to initiate the

specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'. . . ."

[4] General Statutes § 52-184c, entitled "Standard of care in negligence action against health care provider. Qualifications of expert witness," provides in relevant part: "(d) Any health care provider may testify as an expert in any action if he: (1) Is a 'similar health care provider' pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim."

[5] Blakely's cardiologist, who prescribed the Coumadin, was Steven Cohen; her primary care physician was Wayne Paulekas. Neither testified at trial.

[6] The surgery, an incisional biopsy procedure, was performed on a suspicious facial lesion.

communication with the primary care physician." The plaintiffs argued, however, that the question was whether the standard of care for any defendant health care provider, regardless of specialty, requires personal, direct communication with the physician who prescribed the medication.

The defendants' motion noted that Miller, during his deposition, testified that he had no personal familiarity with what the usual and customary practice was in April, 1999, among plastic surgeons regarding communicating with a patient's primary care physician with respect to discontinuing Coumadin prior to performing facial plastic surgery. Bernstein, during the plaintiffs' offer of proof, testified to the same thing.

During their offer of proof at the hearing on the defendants' motion in limine, the plaintiffs argued that the standard of care applicable to Bass in this case applies to all physicians, regardless of specialty, when interrupting or discontinuing another physician's medication regime currently being followed by a patient. In the alternative, the plaintiffs argued that Bass provided "treatment or diagnosis for a condition which is not within his specialty" within the purview of § 52-184c (c) and, therefore, Bernstein and Miller should be considered "similar health care providers." Specifically, the plaintiffs argued that Bass practiced outside his specialty by recommending or ordering Blakely to discontinue Coumadin because its use is within the specialty of cardiology, or within the purview of an internist and, therefore, that Bass should be treated as though he were a cardiologist or an internist for the purpose of allowing the testimony of Miller and Bernstein. The plaintiffs thus argued that this case provides an exception to the usual rule that "[t]he prevailing professional standard of care for a given health care provider shall be that . . . recognized as acceptable and appropriate by reasonably prudent similar health care providers."

General Statutes § 52-184c (a). The court granted the defendants' motion in limine, and precluded Miller and Bernstein from testifying as to the standard of care that Bass should have exercised.

At the conclusion of the trial, the jury found that Bass did not deviate from the standard of care for plastic surgeons in similar circumstances and returned a verdict in the defendants' favor, which the court accepted. On February 4, 2004, the plaintiffs filed a motion to set aside the verdict, which the court denied on March 18, 2004. This appeal followed. Additional facts will be set forth as necessary.

## II

## MOTION IN LIMINE

The plaintiffs argue that the court improperly precluded Miller and Bernstein from testifying that Coumadin should not have been discontinued under the circumstances of this case. The defendants argue that neither Bernstein nor Miller are plastic surgeons and that their proposed testimony did not fit within any exception to § 52-184c.[7]

We begin with the applicable standard of review. The court's preclusion of testimony by a properly disclosed expert witness is an evidentiary ruling. See *Young* v. *Rutkin*, 79 Conn. App. 355, 359, 830 A.2d 340, cert. denied, 266 Conn. 920, 835 A.2d 60 (2003). That decision will not be disturbed unless the court abused its discretion or unless the error is clear and involves a misconception of the law. *Going* v. *Pagani*, 172 Conn. 29, 35, 372 A.2d 516 (1976). An abuse of discretion means a ruling made on untenable grounds. *Whalen* v. *Ives*, 37 Conn. App. 7, 21, 654 A.2d 798, cert. denied, 233 Conn. 905, 657 A.2d 645 (1995). "It is well settled that the trial court's evidentiary rulings are entitled to great

[7] See footnote 4.

deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion." (Citation omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 368–69, 788 A.2d 496 (2002). "[Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Wasko* v. *Manella*, 87 Conn. App. 390, 394, 865 A.2d 1223 (2005). The test for admissibility of the opinion of an expert witness is whether the expert knows the applicable standard of care and can evaluate the defendant's conduct, given that standard. See *Going* v. *Pagani*, supra, 35. Although the admissibility of evidence is discretionary, a trial court's construction of a statute relating to admissibility of evidence is a question of law over which our review is plenary. *Friedman* v. *Meriden Orthopaedic Group, P.C.*, 77 Conn. App. 307, 314, 823 A.2d 364 (2003), aff'd, 272 Conn. 57, 861 A.2d 500 (2004). Even if a court has acted improperly in connection with the introduction of evidence, reversal of a judgment is not necessarily mandated because there must not only be an evidentiary error, there also must be harm. *Rokus* v. *Bridgeport*, 191 Conn. 62, 70, 463 A.2d 252 (1983).

Certain principles are relevant in discussing whether the court abused its discretion by failing to permit the plaintiffs' proffered testimony of two of their expert witnesses. "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002); see also *Davis* v. *Rodriguez*, 364 F.3d 424, 430 (2d Cir. 2004). "Generally,

the plaintiff must present expert testimony in support of a medical malpractice claim because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons." *Boone* v. *William W. Backus Hospital,* 272 Conn. 551, 567, 864 A.2d 1 (2005); see also *Law* v. *Camp,* 116 F. Sup. 2d 295, 305 (D. Conn. 2000). In this appeal, the only issues relate to the introduction of evidence as to that standard of care.

Bass testified that if he ordered a patient to discontinue Coumadin without any input from her cardiologist or internist, namely, the prescribing physician, he would be in violation of a plastic surgeon's standard of care. He also testified that the standard of care for a plastic surgeon is satisfied if the surgeon directs the patient to contact the cardiologist or internist. The plaintiffs sought to introduce the testimony of Miller and Bernstein on the ground that although they had no knowledge of the standard of care for a plastic surgeon, they should nevertheless be allowed to testify because the defendants provided a treatment or diagnosis within the terms of § 52-184c (c) (discontinue Coumadin) that was not within Bass' specialty, but was within the specialties of Miller and Bernstein. The plaintiffs also sought the introduction of the testimony, as previously stated, on the ground that the standard of care for all physicians is to refrain from meddling in the need for the medication as found by another physician treating the same patient. The court disallowed the testimony of both physicians as to the standard of care.[8]

The court reasoned that even if Bass directed the cessation of Coumadin, that was not sufficient to conclude that he was "providing treatment or diagnosis for

---

[8] Both physicians were allowed to testify as to their opinion that the proximate cause of Blakely's stroke and subsequent death was Bass' breach of the standard of care.

a condition which is not within his specialty," as stated in § 52-184c (c). Any direction to Blakely to discontinue Coumadin for a time was given in Bass' role as a plastic surgeon. The court further stated that there was no foundation for a conclusion that the specialty of plastic surgery could be transformed into the specialty of the physician who had prescribed the medication. The court also concluded that the plaintiffs' offer of proof did not establish that the standard of care is the same for all physicians when interfering with another physician's prescription for medication, regardless of specialty.

After the decision of the court to preclude the testimony of Bernstein and Miller, the court allowed the plaintiffs to present the testimony of Shearer, a plastic surgeon. Shearer testified that discontinuing Coumadin prior to an incisional biopsy without direct contact by the surgeon with the prescribing physician and discussion with that physician is a deviation from the standard of care applicable to a plastic surgeon in such cases. There was no evidence in this case that such a discussion had occurred.

In Shearer's opinion, such discussion is vital because in some cases it affects the outcome of the surgery. Shearer stated that the prescriber is the physician who knows about the risk of stroke for the particular patient and that it is the surgeon who knows about the risk of bleeding. It is that shared knowledge that governs the care of the particular patient. His final conclusion was that in performing an incisional biopsy, Coumadin should never be discontinued and that to discontinue the medication is a violation of the standard of care for plastic surgeons.

We conclude that the court was correct that § 52-184c (c) did not require Bass to be treated as an internist or cardiologist for the purpose of allowing Bernstein and Miller to testify as to the standard of care. Also, it

was not proved "to the satisfaction of the court"; General Statutes § 52-184c (d); that Bernstein and Miller possessed sufficient training and experience in a related field to give opinions as to the standard of care for plastic surgeons when recommending the discontinuance of an anticoagulant prior to performing surgery. See *Friedman* v. *Meriden Orthopaedic Group, P.C.*, supra, 77 Conn. App. 319.

We also conclude that the defendants' argument that the standard of care for all physicians providing health care services is that they may never interfere with the medication prescribed by another physician without the acquiescence of the latter is irrelevant on the facts of this case. The particular prescription, Coumadin, a blood thinner, was related to the particular treatment of Blakely by Bass as a plastic surgeon. The treatment required a surgical incision by Bass and involved, therefore, the possibility of bleeding. The court concluded that any direction by Bass to Blakely to discontinue the taking of Coumadin was given in his role as a plastic surgeon and, therefore, that expert testimony about the standard of care was limited to that of a plastic surgeon. Neither Bernstein nor Miller was a plastic surgeon and, therefore, the court correctly precluded their testimony as to the applicable standard of care. Accordingly, the court did not abuse its discretion.

Even if a court has acted improperly in connection with the introduction of evidence, reversal of the judgment is not necessarily mandated because there must be not only evidentiary error, but harm to the plaintiffs. See *Glaser* v. *Pullman & Comley, LLC*, 88 Conn. App. 615, 623, 871 A.2d 392 (2005); *Duffy* v. *Flagg*, 88 Conn. App. 484, 490, 869 A.2d 1270, cert. granted on other grounds, 274 Conn. 909, 876 A.2d 1201 (2005). In this case, Shearer testified that Bass deviated from the standard of care when he failed to contact Blakely's primary care physician or cardiologist directly before

instructing her to stop taking Coumadin. The defendants did not dispute that Bass instructed Blakely to stop taking Coumadin prior to the procedure. Shearer's testimony provided ample support for the jury to find that Bass deviated from the standard of care for plastic surgeons in similar circumstances. The jury, however, did not so find. "The jury is under no obligation to credit the evidence proffered by any witnesses, including experts . . . even if that evidence is uncontroverted." (Citations omitted.) *Mather* v. *Griffin Hospital*, 207 Conn. 125, 145, 540 A.2d 666 (1988). The plaintiffs were, therefore, not harmed by the court's granting of the defendants' motion in limine.

## III

## MEDICAL LITERATURE

### A

### Use of Shearer's Opinion Testimony

The plaintiffs claim that the court improperly precluded them from eliciting testimony from Shearer concerning a certain medical article. Specifically, the plaintiffs sought to have Shearer "testify about the article and to the fact that it supported his own experience that there was no significant increase in bleeding risk for minor surgeries while on Coumadin." Concluding that the probative value of the proposed testimony concerning the article did not outweigh the potential prejudicial effect,[9] the court precluded Shearer from testifying about the content of the article.

This issue pertains to the core of the dispute between the plaintiffs' theory of the case and the defendants'

---

[9] Connecticut Code of Evidence § 4-3, entitled "Exclusion of Evidence on Grounds of Prejudice, Confusion or Waste of Time," provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

theory of the case and, specifically, whether Bass deviated from the applicable standard of care. The plaintiffs' theory was that, as a medical fact, there is no increase in the incidence of bleeding complications associated with this type of surgery for patients taking Coumadin. The defendants argued, and Bass testified, that in this type of surgery, there is a difference in the risk of bleeding complications between those taking and those not taking Coumadin. The article at issue would appear to corroborate the plaintiffs' theory of the case and Shearer's opinion.

The court precluded Shearer from testifying as to whether the article in question confirmed his opinion. The court ruled on the ground that there was a danger of unfair prejudice that was not outweighed by the probative value of such testimony. The court's ruling focused on the issue of unfair prejudice because the article had not been the subject of any disclosure or discovery request. When the defendants first deposed Shearer, Shearer stated that his opinion was not based on a specific piece of medical literature. Subsequent to that deposition, counsel for the plaintiffs sent Shearer several articles, many of which had appeared in dermatology journals, including the one at issue. Central to the court's ruling was the fact that Shearer did not read the article until after his deposition and, by his own admission, did not find any articles corroborating his opinion in medical literature covering the field of plastic surgery.

The plaintiffs do not specifically argue that the court abused its discretion in concluding that the probative value of testimony concerning the article was outweighed by its potential prejudicial effect. Instead, the plaintiffs cite § 7-4 (b) of the Connecticut Code of Evidence as support for their claim that the court improperly precluded Shearer from testifying about the

article.[10] The plaintiffs concede that they did not offer the article as a full exhibit through Shearer. They argue, however, that the court should have permitted Shearer to "testify about the article and to the fact that it supported his own experience that there was no significant increase in bleeding risk for minor surgeries on Coumadin."

Section 7-4 (b) of the Connecticut Code of Evidence provides that an expert's opinion may be *based* on facts that are not "admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. . . ." Such facts, however, "are not substantive evidence, unless otherwise admissible as such evidence." Conn. Code Evid. § 7-4 (b). The gist of the plaintiffs' argument is that because an expert may base his or her opinion on facts that are otherwise not admissible in evidence, that expert ought to be permitted to testify about those facts and how they corroborate his or her opinion.

The problem with that argument is that the "facts" at issue in this case concern the content of an article. Specifically, the plaintiffs sought to elicit testimony from Shearer that the article in question supported the proposition that patients taking Coumadin did not have an increased risk of bleeding complications in the type of surgery Bass performed in this case. "In Connecticut, an out-of-court statement offered to prove the truth of the matter asserted is hearsay. . . . If such a statement is offered for a purpose other than establishing the truth

---

[10] Connecticut Code of Evidence § 7-4, entitled "Opinion Testimony by Experts; Bases of Opinion Testimony by Experts; Hypothetical Questions," provides in relevant part: "(b) Bases of opinion testimony by experts. The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence. . . ."

of the matters contained in the statement, it is not hearsay." (Internal quotation marks omitted.) *Raybeck* v. *Danbury Orthopedic Associates, P.C.*, 72 Conn. App. 359, 376, 805 A.2d 130 (2002).

Although the plaintiffs concede that they did not offer the article as a full exhibit, they did seek to have Shearer testify about the content of that article, and they sought to have that content offered to prove the truth of the matter asserted, namely, that Coumadin did not increase the incidence of bleeding complications in the type of surgery at issue in this case. As hearsay, testimony concerning the content of the article was admissible only if the article came within one of the exceptions to the hearsay rule. Section 8-3 (8) of the Connecticut Code of Evidence provides for the admissibility of treatises, such as the article at issue in this case, under certain circumstances.[11] The plaintiffs did not seek to introduce the article into evidence through Shearer under § 8-3 (8).

We conclude that the court did not abuse its discretion in precluding Shearer from testifying as to the content of the article for purposes of corroborating his opinion about the applicable standard of care. Shearer, himself, acknowledged that he did not base his opinion on any specific piece of medical literature. Furthermore, even were we to conclude that the court abused its discretion in precluding Shearer from testifying about the article and that the plaintiffs were harmed by such preclusion, any testimony regarding the content

---

[11] Connecticut Code of Evidence § 8-3, entitled "Hearsay Exceptions: Availability of Declarant Immaterial," provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (8) Statement in learned treatises. To the extent called to the attention of an expert witness on cross-examination or relied on by the expert witness in direct examination, a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art, recognized as a standard authority in the field by the witness, other expert witness or judicial notice. . . ."

of the article was inadmissible hearsay and, therefore, properly precluded. See *Webster Bank* v. *Oakley*, 265 Conn. 539, 554 n.14, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004); see also *Message Center Management, Inc.* v. *Shell Oil Products Co.*, 85 Conn. App. 401, 409 n.6, 857 A.2d 936 (2004) ("[w]here the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it" [internal quotation marks omitted]).

B

Use of Article to Impeach the Defendants'
Expert Witness

We next address the plaintiffs' claim that the court improperly precluded them from introducing the same article for the purpose of impeaching the credibility of physician Joel Rein, the defendants' expert witness. The court precluded the plaintiffs from using the article during their cross-examination of Rein on the ground that its potential prejudicial effect was not outweighed by its probative value. The court also noted that Rein did not recognize the article as authoritative on the issue of the applicable standard of care.

"In the cross-examination of experts, extracts from treatises either relied on by the expert on direct or recognized by the expert as authoritative may be used in questions to test the expert's qualifications and opinion." C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.11.2, p. 539; *Kaplan* v. *Mashkin Freight Lines, Inc.*, 146 Conn. 327, 330–31, 150 A.2d 602 (1959); *State* v. *Wade*, 96 Conn. 238, 250–51, 113 A. 458 (1921); see also *Harlan* v. *Norwalk Anesthesiology, P.C.*, 75 Conn. App. 600, 605, 816 A.2d 719, cert. denied, 264 Conn. 911, 826 A.2d 1155 (2003).

Rein testified that he had neither read the article nor recognized it as authoritative. Furthermore, Rein

testified that he did not rely on the article in forming his opinion as to the standard of care applicable in this case. In fact, the article postdated by four years the surgery performed by Bass. The court allowed the plaintiffs to inquire of Rein whether he had read the article, which had been appended to the deposition testimony of one of the plaintiffs' experts, Bernstein, which Rein had reviewed prior to trial. The court, however, would not allow any questions concerning the substance of the article. We conclude that the court did not abuse its discretion in precluding the plaintiffs from using the article for purposes of impeachment during cross-examination of Rein.

The judgment is affirmed.

In this opinion the other judges concurred.