DENIS DALLAIRE, ADMINISTRATOR (ESTATE OF SANDRA DALLAIRE) *v.* VEN C. HSU
(AC 32435)

DiPentima, C. J., and Gruendel and Borden, Js.

---

[4] The court, of course, is free to request additional briefing and argument on the issues.

600

Argued May 16—officially released August 9, 2011

*George W. Kramer*, for the appellant (plaintiff).

*Eliot B. Gersten*, with whom, on the brief, was *John H. Van Lenten*, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiff, Denis Dallaire, as administrator of the estate of the decedent, Sandra Dallaire, brought this medical malpractice action, alleging that the defendant, Ven C. Hsu, negligently prescribed lethal amounts of opiate medications, resulting in her death.[1] The trial court rendered judgment in favor of the defendant. On appeal, the plaintiff argues that the court improperly (1) found that the decedent had a significant tolerance to morphine and methadone, and that the standard of care did not require the defendant to consult with the plaintiff's prior health care providers or to obtain her pharmacy records to determine her level of tolerance, (2) found that the plaintiff failed to prove causation and (3) disregarded the opinion of the

[1] The defendant is not a board certified physician but has a valid medical license in Connecticut and has practiced as a pain specialist since 1989. The defendant, by holding himself out as a pain specialist, is held to the standard of care of board certified physicians who also practice pain management. See *Grondin* v. *Curi*, 262 Conn. 637, 650–51, 817 A.2d 61 (2003) (standard of care for specialist); see also General Statutes § 52-184c (c).

plaintiff's expert on causation.[2] We affirm the judgment of the trial court.

The court found the following facts. The decedent suffered from Madelung's disease, a congenital skeletal deformity resulting in years of chronic pain, multiple fractures and surgeries. For at least six years prior to seeing the defendant, the decedent was prescribed a variety of narcotic medications to alleviate her chronic pain. Between 2003 and June 27, 2005, the decedent was treated by Karen Warner, a physician at the Comprehensive Pain & Headache Treatment Centers, LLC (treatment center). Subsequent to the decedent's discharge from the treatment center, the decedent received prescriptions for opiate medications from a number of unaffiliated physicians. Then, on July 20, 2005, the decedent saw David S. Kloth, a physician at Connecticut Pain Care, P.C. According to Kloth's records, the decedent informed him that the final prescriptions issued to her on discharge from the treatment center included "OxyContin 80 mg qid, [m]ethadone 80 mg qid, Duragesic 200 mcg q 72 hrs, Valium 10 mg qid and Soma qid."[3] Kloth reduced the decedent's prescriptions solely to methadone 10 mg q.i.d. On October 13,

---

[2] Because we affirm the court's finding that the defendant did not breach the standard of care, we need not address the issue of causation. See *Kalams* v. *Giacchetto*, 268 Conn. 244, 250, 842 A.2d 1100 (2004) ("[t]he jury was not required to reach the issue of causation because . . . it first determined that the defendant had not breached the standard of care"). We, therefore, also need not reach the issue of whether the court properly disregarded the opinion on causation given by George Adam, the plaintiff's expert. We note that the court, acting in its role as the trier of fact, found that the plaintiff's expert, Daniel E. Buffington, did not adequately opine that the dosages, if taken as prescribed by the defendant, caused the decedent's death.

[3] "Q.i.d." is a medical abbreviation for quater in die, or four times a day. See Stedman's Medical Dictionary (28th Ed. 2006) p. 1615 (noting that "q" is a medical abbreviation for quodque, or "every"). Id. Thus, the decedent's prescription of "Duragesic 200 mcg q 72 [hours]" indicates that the decedent was prescribed 200 micrograms of the drug every 72 hours. See id.

2005, Kloth issued the decedent a final prescription for methadone, 10 mg q.i.d. for twenty-eight days.

On October 27, 2005, the decedent saw the defendant, who specializes in pain management. The decedent provided the defendant with the pharmacy records from Warner but not those of Kloth, "even though she had, that very day, obtained her complete prescription records, including Kloth's, from Walgreens Pharmacy." The defendant believed that the decedent was out of medication and that if she did not receive any, she might engage in drug seeking behaviors. The defendant considered this to be an "emergency and urgent."[4] The defendant prescribed "[m]ethadone, 40 mg 4 pills/day, MS Contin 60 mg 2/day, Xanax 1 mg 3/day."[5] At approximately 1 a.m., on October 28, 2005, the plaintiff found the decedent nonresponsive, and emergency responders were unable to revive her. The medical examiner listed the cause of the decedent's death as opiate toxicity.

Thereafter, the plaintiff commenced this action. The defendant filed a special defense, alleging that the decedent was contributorily negligent.[6] Following a trial to

[4] The plaintiff's expert opined that the decedent's severe pain did not obviate the defendant's breach of the standard of care. The defendant's expert opined that the decedent presented "with what appeared to be a crisis; that [the defendant] calculated what he believed was an appropriate dose of medication to help treat [the decedent's] severe pain . . . ." The court agreed with the opinion of the defendant's expert.

[5] MS Contin is a brand of controlled release morphine. See Physician's Desk Reference (60th Ed. 2006) p. 2697. Morphine and methadone hydrochloride are both narcotic, opiate analgesics. Stedman's Medical Dictionary (28th Ed. 2006) pp. 1227, 1196 (defining "narcotic" in relevant part as "any drug derived from opium or opium-like compounds with potent analgesic effects associated with both significant alteration of mood and behavior with potential for dependence and tolerance"). Id., p. 1281. Xanax, or alprazolam, is a benzodiazepine used to treat anxiety disorders. See Physician's Desk Reference, supra, p. 2656.

[6] Connecticut has adopted the doctrine of comparative negligence. However, our statutes retain the term "contributory negligence." See, e.g., General Statutes §§ 52-114 and 52-572h (b). *Utica Mutual Ins. Co.* v. *Precision*

the court, it issued a memorandum of decision in favor of the defendant. This appeal followed.

We begin by setting forth the legal principles that guide our analysis. The trial court's findings of fact are binding on this court "unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole." (Internal quotation marks omitted.) *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 828, 742 A.2d 322 (1999). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Schiavone* v. *Bank of America, N.A.*, 102 Conn. App. 301, 304, 925 A.2d 438 (2007).

Conflicting expert testimony "does not necessarily equate to insufficient evidence." *Carusillo* v. *Associated Women's Health Specialists, P.C.*, 79 Conn. App. 649, 656, 831 A.2d 255 (2003). Where such testimony does conflict, "the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *Bay Hill Construction, Inc.* v. *Waterbury*, 75 Conn. App. 832, 838, 818 A.2d 83 (2003).

Finally, to recover in a medical malpractice action, the plaintiff must prove "(1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks

*Mechanical Services, Inc.*, 122 Conn. App. 448, 460 n.10, 998 A.2d 1228, cert. denied, 298 Conn. 926, 5 A.3d 487 (2010).

omitted). *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002). Guided by these principles, we address the plaintiff's claims in turn.

The plaintiff first claims that the defendant deviated from the standard of care required by reasonably prudent physicians in the defendant's position. See General Statutes § 52-184c (a). Specifically, the plaintiff argues that the court's finding that the decedent was opiate tolerant was clearly erroneous.[7] We disagree.

Physicians are required to exercise "the degree of skill, care, and diligence that is customarily demonstrated by physicians in the same line of practice." *Edwards* v. *Tardif*, 240 Conn. 610, 614, 692 A.2d 1266 (1997). To prove that a physician has breached the standard of care, the plaintiff must produce "some evidence that the conduct of the physician was negligent." Id. The plaintiff, generally, must present the testimony of expert witnesses to establish the applicable standard of care and the defendant's failure to conform to this standard.[8] *Kunst* v. *Vitale*, 42 Conn. App. 528, 536, 680 A.2d 339 (1996).

An issue at trial was whether the decedent was opiate tolerant or opiate naive. The court found that the defendant "would not have prescribed the same dosages to an opiate naive person, because they could be lethal."[9]

---

[7] On the basis of the expert opinion testimony presented to it, the court defined an "opiate naive" patient as one "who has not previously taken or been exposed to opiates," and "opiate tolerant" as one "whose dose to control symptoms has been escalating, because the metabolism has learned to accommodate and handle the drug more efficiently than before."

[8] Plaintiffs need not present expert testimony, however, where the physician's actions or omissions rise to the level of gross negligence. *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 813, 945 A.2d 955 (2008). The plaintiff does not argue that the defendant was grossly negligent.

[9] On cross-examination, the defendant's expert and the plaintiff's counsel engaged in the following colloquy:

"[The Plaintiff's Counsel]: Okay. The dosage that [the defendant] prescribed here, 40 milligrams, six tablets, 240 per day, is that a potentially lethal dosage of methadone?

"[Matthew Kline]: If a narcotic naive patient—as you're saying, someone that was on no narcotics at all—took a dose of 240 milligrams of methadone, it is most certainly potentially lethal."

The experts first differed with respect to the definitions of the terms "opiate naive" and "opiate tolerant." The defendant's expert, Matthew Kline, a physician, board certified in pain management and anesthesiology, defined an opiate naive patient as someone "who has never been on a narcotic." The plaintiff's expert, George Adam, a physician, board certified in psychiatry and neurology, defined an opiate naive patient as "someone who has not taken opiates, or has taken very low doses," and an opiate tolerant patient as "someone whose metabolism has learned to efficiently accommodate and detoxify the body from narcotics." The plaintiff also offered the testimony of Daniel E. Buffington, a clinical pharmacologist, who defined an opiate naive patient as "someone who is not acclimated to that product," and an opiate tolerant patient as one who has had "chronic regular exposure" to the drug. The court adopted Kline's definition of opiate naive and declined to give weight to the opinions of the plaintiff's experts.

The experts also differed in applying these terms to the present case. Kline concluded that the decedent had "significant opiate tolerance" at the time she visited the defendant.[10] The court agreed, finding that the decedent had a long history of taking opiate medications as

---

[10] At oral argument before this court, the plaintiff argued that the decedent took her medications as prescribed, and that under General Statutes § 52-114, the decedent is entitled to a presumption that she acted reasonably. Section 52-114 provides in relevant part that "[i]n any action to recover damages for negligently causing the death of a person . . . it shall be presumed that such person whose death was caused or who was injured or who suffered property damage was, at the time of the commission of the alleged negligent act or acts, in the exercise of reasonable care. If contributory negligence is relied upon as a defense, it shall be affirmatively pleaded by the defendant or defendants, and the burden of proving such contributory negligence shall rest upon the defendant or defendants." We affirm the court's finding that the defendant did not breach the standard of care and, therefore, we need not reach the issue of the decedent's negligence or the presumption of due care in § 52-114.

a result of her chronic condition.[11] Adam concluded that the decedent was "on the naive side." Buffington concluded that, because Kloth prescribed lower dosages of methadone than Warner, the decedent was "opiate tolerant to methadone—but at a much lower level" than before seeing Kloth. Buffington concluded further that the decedent was opiate naive to morphine. Adam and Buffington both opined that, because the decedent was opiate naive, the standard of care required the defendant to begin treatment with starting doses of methadone and morphine.

The court found that, with respect to the opinions of the plaintiff's experts, their "premise is faulty" because the decedent was not opiate naive. With respect to Adam, the court found that his experience in practicing pain management was merely incidental to his neurology specialty, and, as such, the court did not give Adam's opinion weight. With respect to Buffington, the court found that Buffington's opinion that the decedent was opiate naive to morphine was "not tenable" in light of the decedent's medical history and that this conclusion "undermines his credibility." On the basis of the evidence presented to the court, we conclude that the court was justified in declining to give weight to Adam's and Buffington's opinions. See *Bay Hill Construction, Inc.* v. *Waterbury*, supra, 75 Conn. App. 838. Thus, the court's finding that the decedent was opiate tolerant was not clearly erroneous.

Second, the plaintiff contends that the defendant breached the standard of care by failing to consult with the decedent's prior health care providers and failing

---

[11] Kline opined at trial that the defendant was presented with an "extremely complicated case, in which a patient who had many, many years of chronic pain, well documented severe pain, had been on . . . very, very large doses of multiple narcotics."

to obtain her prior pharmacy records to determine her level of tolerance.[12] We disagree.

The court found that the defendant was entitled to assess the decedent's condition independently, on the basis of Kline's testimony that "[p]atient history and the forthright nature of a patient is a critical part . . . of treatment." See *Farrell* v. *Bass*, 90 Conn. App. 804, 812–15, 879 A.2d 516 (2005) (plastic surgeon was not liable for malpractice where jury found that standard of care did not require consultation with patient's internist or cardiologist before instructing patient to stop taking anticoagulants, which were prescribed by those physicians). The court found that the standard of care, as defined by the plaintiff's experts, reflects a "narrow textbook approach to the practice of pain management and ignores the role of the patient-physician interaction." The defendant spoke with the patient, took a detailed history and, on the basis of all the circumstances, prescribed medications accordingly.[13]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] Buffington opined that the defendant, on the basis of the "severity and the potential complications from the dosing levels that he was prescribing . . . had the duty to discern the accuracy of that patient history, as a peer-to-peer or vendor-to-vendor, if it's confirming with the pharmacy as well."

[13] Kline opined that pain management physicians rely on their experience and intuition "because medicine is certainly not an exact science. . . . Part of [medicine] is to determine whether or not a patient is being forthright."