KAREN GUERRI, ADMINISTRATOR (ESTATE OF CRAIG S. GUERRI) *v.* MARK FIENGO ET AL.
(AC 33090)

Robinson, Bear and Schaller, Js.

it reasonably believes to be credible. *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 26, 807 A.2d 955 (2002).

Argued January 17—officially released August 14, 2012

*Stephen M. Reck*, with whom was *Joseph P. Zeppieri*, for the appellant (plaintiff).

*Thomas W. Boyce*, with whom was *Jennifer Antognini-O'Neill*, for the appellee (named defendant).

*Opinion*

SCHALLER, J. The plaintiff, Karen Guerri, the administrator of the estate of Craig S. Guerri (decedent), appeals from the judgment of the trial court rendered after a jury verdict in favor of the defendant Mark

Fiengo, a cardiologist.[1] On appeal, the plaintiff claims that the court improperly refused to submit an allegation of negligence to the jury. Specifically, the plaintiff claims that the evidence presented at trial, in fact, did establish that the defendant had a duty to contact the decedent's treating physician despite the absence of a "critical value" on the decedent's electrocardiogram.[2] We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the present appeal. At approximately 8 a.m. on December 17, 2006, the decedent, suffering from chest pains and numbness in his left arm, went to the emergency room of the Pequot Treatment Center in Groton. Pursuant to established procedures, a triage nurse performed an electrocardiogram. The results of the electrocardiogram indicated an "abnormal result."[3] Michael Alper, a physician working in the emergency room at that time, reviewed the results of the electrocardiogram

[1] The original complaint also named Fiengo's employer, Lawrence and Memorial Hospital, Inc., as a defendant. The trial court consolidated the present action with a case filed by the plaintiff against Michael Alper, another physician who had rendered care to the decedent. On August 20, 2010, the plaintiff withdrew her claim against the hospital. On February 28, 2011, the plaintiff withdrew her claim against Alper. We refer to Feingo as the defendant hereafter.

[2] A "critical value" is defined in Lawrence and Memorial Hospital's policy on critical tests and critical values as "[a]ny test value/level/interpretation where delay in reporting may cause serious adverse outcomes for patients." Established hospital procedures require that "[a] list of critical values specific to the department will be maintained in the clinical laboratory, imaging services and cardiology departments, and is approved by the medical staff." The hospital's department of cardiology maintained a list stating that the following electrocardiogram results were considered "critical": (1) malignant arrhythmia, (2) acute or recent unsuspected myocardial infarction, (3) pacemaker malfunction and (4) a "QT" segment interval of greater than five tenths of a millisecond. The plaintiff does not argue in the present appeal that the decedent's electrocardiogram contained a critical value. See footnote 8 of this opinion.

[3] Approximately 80 percent of the electrocardiograms reviewed by the defendant each day contain an "abnormal result."

and examined the decedent. Apler subsequently diagnosed the decedent with atypical chest wall pain and discharged him. At approximately 10 a.m., the defendant, the on-call cardiologist at Lawrence and Memorial Hospital, received and reviewed a copy of the decedent's electrocardiogram.[4] The defendant concluded that no critical values were present and took no further action. On December 20, 2006, the decedent died. According to the testimony of the medical examiner, the cause of the decedent's death was a myocardial infarction brought on by a spontaneous dissection of the coronary artery.

On March 16, 2009, the plaintiff commenced the present action against the defendant alleging medical malpractice. Paragraph 20 of the operative complaint, filed on June 10, 2010, alleged that the defendant was negligent in that he: "(a) failed to record a complete and accurate reading of the electrocardiogram that had been taken from the decedent . . . that morning, (b) failed to call the Pequot Treatment Center and/or the treating physician to report critical findings of the electrocardiogram, (c) failed to take steps to confirm whether or not [the decedent] was having a myocardial infarction and/or [a] dangerous cardiac event, (d) failed to inform the Pequot Treatment Center and/or the treating physician that the [decedent] had suffered or may have suffered a myocardial infarction, (e) failed to take steps to properly diagnose [the decedent], (f) failed to take steps to properly treat [the decedent], (g) failed to follow the Lawrence and Memorial Hospital [p]olicy [on] [c]ritical [t]ests and [c]ritical [v]alues in that [the defendant] did not call the ordering physician to inform him of findings that could cause serious adverse outcomes to the [decedent], (h) failed to contact the Pequot Treatment Center

---

[4] Electrocardiograms administered at the Pequot Treatment Center are forwarded electronically to Lawrence and Memorial Hospital to be reviewed by the on-call cardiologist. This process is known as "overreading."

and/or the treating physician to further discuss the [decedent],[5] (i) failed to recommend that the Pequot Treatment Center immediately obtain serum troponin and cardiac enzyme levels on the blood of [the decedent], (j) failed to recommend that [the decedent] be admitted to the hospital and (k) improperly diagnosed [the decedent]."[6]

At trial, the plaintiff offered the expert testimony of Mark Schiffer, a board certified cardiologist. On direct examination, the plaintiff's attorney questioned Schiffer about the standard of care applicable to each allegation of negligence contained in the complaint. Schiffer offered the following testimony relating to the allegation of negligence contained within paragraph 20 (b):

"Q. What is the standard of care regarding calling the emergency room doctor caring for the patients with . . . critical findings [on their electrocardiogram]?

"A. The standard of care requires the interpreting cardiologist to call the referring doctor, or the treating doctor, to inform him of the critical findings."

Shortly thereafter, Schiffer offered the following testimony relating to the allegation of negligence contained within paragraph 20 (h):

"Q. What is the standard of care regarding the cardiologist's duty to contact the people at [the] treatment center and/or the treating physician to further discuss issues concerning the patients?

[5] We note that the transcripts and briefs filed with this court refer to this allegation by its designation in the original complaint, paragraph 20 (e). For the purposes of the present appeal, we refer to this allegation as it is numbered in the operative complaint.

[6] The allegations of negligence contained within subparagraphs (c), (e), (f), (h) and (j) of the operative complaint were not submitted to the jury. The plaintiff's sole claim in the present appeal relates to the allegation of negligence contained within paragraph 20 (h).

"A. In the course of calling to report the critical findings, the standard of care would be to have a discussion if initiated by the treating physician regarding circumstances of the case to shed further light on the clinical situation to further aid the doctor in making the most accurate interpretation of the treating possible."

During cross-examination, defense counsel asked Schiffer the following question: "[I]f the overreader reads the [electrocardiogram] and is of the opinion that it does not present evidence of a critical value then he was to record his interpretations and that interpretation then gets filed?" Schiffer responded, "Yes." Defense counsel continued: "You're not suggesting that every single [electrocardiogram] that has on it from the computer 'abnormal' requires the overreader to [contact] the ordering physician?" Schiffer responded, "Certainly not."

On redirect examination, Schiffer expounded on this concept, indicating that some abnormalities represent a critical value and that these abnormalities require a call to the treating physician. Specifically, Schiffer testified: "[T]here are certain abnormalities that rise to the level of being a critical value. And that is something that can be recognized by a cardiologist. And that when they see that critical value or type of abnormality that requires a call. That's the standard of care not for minor abnormalities or things that could reasonably be expected to be a nonserious problem."

After the close of evidence, the defendant objected to the court's proposed jury instructions pertaining to the allegation of negligence set forth in paragraph 20 (h), arguing that the broadness of the allegation would require an overreading cardiologist to contact the treating physician in every circumstance but that the standard of care established by Schiffer's testimony requires such contact only when a critical value is present. The

court agreed and, accordingly, refused to instruct the jury on the allegation of negligence set forth in paragraph 20 (h). The jury subsequently returned a verdict in favor of the defendant. This appeal followed.

On appeal, the plaintiff claims that the court erred in concluding that Schiffer's testimony did not demonstrate that the standard of care owed by the defendant as an overreading cardiologist included a duty to contact Alper despite the absence of a critical value. The plaintiff argues that, as a result, the court improperly prevented the jury from considering the allegation of negligence contained within paragraph 20 (h).

"Our standard of review concerning claims of instructional error is well settled. . . . The trial court must adapt its instructions to the issues raised in order to give the jury reasonable guidance in reaching a verdict and not mislead them. . . . Claims of error addressed to the [jury] charge are tested by the pleadings and by the evidence . . . . The court has a duty to submit to the jury no issue upon which the evidence would not reasonably support a finding. . . . The court should, however, submit to the jury all issues as outlined by the pleadings and as reasonably supported by the evidence." (Citation omitted; internal quotation marks omitted.) *Rua* v. *Kirby*, 125 Conn. App. 514, 516–17, 8 A.3d 1123 (2010); see also *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 136, 998 A.2d 730 (2010). "When reviewing a trial court's decision that the evidence was not sufficient to support the submission of an issue to the jury, we must consider the evidence produced by the plaintiff in the light most favorable to him. . . . Whether the plaintiff has established a prima facie case entitling the plaintiff to submit a claim to a trier of fact is a question of law over which our review is plenary." (Citation omitted.) *DiStefano* v. *Milardo*, 276 Conn. 416, 421–22, 886 A.2d 415 (2005).

The elements of a medical malpractice claim are well established. The plaintiff is required to prove the following by a preponderance of the evidence: "(1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 484, 927 A.2d 880 (2007). "Physicians are required to exercise the degree of skill, care, and diligence that is customarily demonstrated by physicians in the same line of practice. . . . To prove that a physician has breached the standard of care, the plaintiff must produce some evidence that the conduct of the physician was negligent. . . . The plaintiff, generally, must present the testimony of expert witnesses to establish the applicable standard of care and the defendant's failure to conform to this standard." (Citations omitted; internal quotation marks omitted.) *Dallaire* v. *Hsu*, 130 Conn. App. 599, 604, 23 A.3d 792 (2011).

The allegation of negligence at issue in the present case is that the defendant "failed to contact the Pequot Treatment Center and/or the treating physician to further discuss the [decedent]." This paragraph alleges that an overreading cardiologist has a duty to discuss every electrocardiogram with the treating physician. The record contains no evidence supporting such a standard of care. Indeed, Schiffer's testimony affirmatively indicates that the overreading cardiologist has a duty to contact the treating physician when a critical value is present. Specifically, when questioned directly by the plaintiff's attorney about the standard of care applicable to the allegation of negligence contained in paragraph 20 (h), Schiffer stated that "[*i*]*n the course of calling to report the critical findings*, the standard of care would be to have a discussion *if initiated by the treating physician* regarding circumstances of the

case to shed further light on the clinical situation . . . ." (Emphasis added.)

The plaintiff contends that, despite the previously cited testimony of Schiffer, the standard of care required to support the allegation of negligence contained within paragraph 20 (h) may be found elsewhere in Schiffer's testimony. Specifically, the plaintiff draws this court's attention to a portion of Schiffer's testimony regarding the issue of lead misplacement.[7] On direct examination, Schiffer testified that when lead misplacement is suspected "there would be a phone call to the treating doctor saying this, you know, we cannot exclude that there is a heart attack going on here and even if there's a potential of lead misplacement certainly the patient has to have another [electrocardiogram] to determine whether [the heart attack is] real or whether it's due to an error in the way the test was performed." The plaintiff claims that this testimony establishes a standard of care that requires an overreading cardiologist to contact the treating physician every time lead misplacement is suspected. Schiffer's testimony, however, explicitly predicates the overreading cardiologist's duty to contact the treating physician regarding the possibility of lead misplacement on the presence of a critical value, namely, readings indicative of an acute or ongoing heart attack.[8] Consequently, this portion of Schiffer's testimony does not support a standard

[7] According to the testimony offered at trial, lead misplacement occurs when the individual administering the electrocardiogram places the electronic leads in the incorrect location on the patient's body. Such misplacement can cause errors in the electrocardiogram.

[8] The allegation that the defendant failed to contact the decedent's treating physician to report the presence of a critical value was set forth in paragraph 20 (b) of the operative complaint and submitted to the jury as a separate claim of negligence. The court's disposition of this allegation in favor of the defendant is not at issue in the present appeal. The plaintiff's sole claim of error is that the trial court erred in refusing to submit the allegation of negligence set forth in paragraph 20 (h) to the jury. The plaintiff does not argue in her brief that the decedent's electrocardiogram contained a critical value.

of care that would have required the defendant to contact the decedent's treating physician despite the absence of a critical value.[9]

Absent evidence that the defendant possessed a duty to contact the decedent's treating physician when no critical value was present, the court correctly concluded that the plaintiff failed to establish a prima facie case requiring the submission of the allegation of negligence contained within paragraph 20 (h) of the operative complaint to the jury.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] The plaintiff also draws this court's attention to Schiffer's statement that the particular abnormality contained within the decedent's electrocardiogram, a condition known as "poor R wave progression," indicates the presence of an "old myocardial infarction as recent as [twelve] hours old" and, consequently, requires a follow up with the treating physician. As with the discussion of lead misplacement set forth previously, Schiffer's testimony that the decedent's poor R wave progression required the defendant to contact the decedent's treating physician is predicated on the conclusion that the decedent's electrocardiogram was indicative of a recent unsuspected myocardial infarction. Like an acute myocardial infarction, a recent unsuspected myocardial infarction represents a critical value. See footnote 2 of this opinion. Again, the plaintiff does not claim that such a reading was contained on the decedent's electrocardiogram. See footnote 8 of this opinion. Consequently, this testimony also does not establish a standard of care that would have required the defendant to contact the decedent's treating physician despite the absence of a critical value.